UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KAREN GAMMON,               )
                           )
            Plaintiff,      )        CIVIL ACTION NO.
                           )        1:18-CV-11665-DPW
v.                          )
                           )
RELIANCE STANDARD LIFE      )
INSURANCE COMPANY,          )
                           )
                           )
            Defendant.      )

MEMORANDUM AND ORDER
March 12, 2020

Karen Gammon seeks long term disability benefits from
Reliance Standard Life Insurance Company, the disability
insurance provider for her former employer, Cape Cod Hospital.
After two decades of work for the company, Ms. Gammon left her
job at the hospital and filed for long term disability benefits
from Reliance Standard.  Reliance Standard provided over three
years of benefits, but denied further benefits in 2016 because,
it said, she was not totally disabled.

There is evidence in the record to support both the
contention that Ms. Gammon is fully disabled physically and that
she is not.  Under these circumstances, where I review Reliance
Standard's decision under a deferential standard, I will grant
Reliance Standard's motion for summary judgment because its
determination, while not inevitable, was based on substantial
evidence in the record.

# I. BACKGROUND

## *A.    Factual Background*

Ms. Gammon, the plaintiff, worked as a medical transcriber at Cape Cod Hospital for 23 years.  In May, 2012, she left her job there because, she says, sitting for longer than 20 minutes at a time gave her excruciating pain.  She applied for long term total disability benefits through her former employer's long term disability insurance provider, defendant Reliance Standard.  Ms. Gammon's claim was based on her stated inability to sit or stand without excruciating pain, her statement that she took narcotics for pain and that she could not drive, and a statement of support from her primary care physician, Kumara Sidhartha, M.D.

The relevant provisions of the Reliance Standard Group Long Term Disability Insurance Policy are as follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>
> (1)    During . . . the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation; . . .
>
> (2)    after a Monthly Benefit has been paid for 36 months, an Insured cannot perform the material duties of Any Occupation.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

Page 2.1.

**INSURING CLAUSE:** We will pay a Monthly Benefit if an Insured:

(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy;
(2) is under the regular care of a Physician;
(3) has completed the Elimination Period; and
(4) submits satisfactory proof of Total Disability to us.

Page 9.0

**LIMITATIONS. MENTAL OR NERVOUS DISORDERS:** Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period. The Monthly Benefit will be payable while so confined, but not beyond the Maximum Duration of Benefits.

Page 12.0.

As these provisions direct, Ms. Gammon was entitled to total disability benefits limited to 24 months if she could show that she could not work as a medical transcriber due in whole or in part to psychological limitations, such as a depressive or anxiety disorder. Alternatively, Ms. Gammon was entitled to total disability benefits for 36 months if she could show that she could not work as a medical transcriber due to total disability based solely on physical sickness or injury.

Ultimately, in order to continue receiving benefits from Reliance Standard after 36 months, Ms. Gammon was required to show that, solely because of physical disability, she could not work any job at all for which she was reasonably qualified.

Reliance Standard approved Ms. Gammon's disability claim on January 3, 2013 and issued monthly benefits to her beginning, in arrears, in November, 2012. Reliance Standard ultimately terminated her benefits on July 28, 2016, after determining that she was capable of working. Ms. Gammon disputes that she is able to work at all.

In support of its present contention that Ms. Gammon could work, Reliance Standard gathered all available records of Ms. Gammon's treatment providers and Ms. Gammon's Social Security Administration file. Reliance Standard also conducted independent surveillance of her activity, which it says contradicts her statements about her capabilities. In addition, Reliance Standard obtained, through a third party vendor, an opinion from Dr. Frank Polanco, M.D. The evidence is reflected in Reliance Standard's March 21, 2019 report (the "report").

Ms. Gammon's medical records indicate she prefers to stand during doctor visits, has migraine headaches, low back pain, a BMI of about 36, hypertension, type 2 diabetes, hyperlipidemia, hyptertension, retinopathy, that she can lift only ten pounds, and needs a fentanyl patch and dilaudid for pain. The SSA approved Ms. Gammon for disability benefits because of her Major Depressive Disorder, but found nevertheless that based on strength factors, physically she had significant sustained work

capability.  In his review, Dr. Polanco concluded that Ms.
Gammon was capable of full-time employment at a sedentary level.

Ms. Gammon contends that her physical disability renders
her incapable of any work.  The surveillance, she says, only
shows her driving to and from doctors' appointments and carrying
lightweight plastic bags.  The surveillance does not show her
sitting longer than 30 minutes.

Ms. Gammon also says that the report does not consider the
medical examinations performed by Dr. Vincent P. Birbiglia in
2016 and 2018, even though she had provided Reliance Standard
with records of those examinations.  Dr. Birbiglia concluded
that there were three issues that impaired Ms. Gammon's ability
to work.  First, the pain in Ms. Gammon's right lumbosacral area
that prevents her from sitting.  Second, her migraine headaches
that her prescribed medication has not been helping.  Third, her
repeated complaints of cognitive issues.  Dr. Birbiglia
concluded that these three factors render Ms. Gammon unable to
work any job.  None of those factors is psychological.

Furthermore, Ms. Gammon contests Reliance Standard's
characterization of the SSA's reason for granting her disability
benefits.  She claims she was awarded SSDI because of her
fibromyalgia and back disorders, which are physical disabilities
covered by Reliance Standard's policy.  Ms. Gammon also asserts
that the reviewer Reliance Standard engaged through a third

party vendor did not consider Dr. Susan R. Ehrenthal's report, which offers the diagnosis that Ms. Gammon has sciatica (which causes her pain), fibromyalgia, and depression. Ms. Gammon contends that, while she has suffered from depression, that depression is caused by her physical ailments and those physical ailments alone render her incapable of working any job.

In short, the parties present conflicting evidence, and conflicting interpretations of evidence, regarding Ms. Gammon's capacity for work.

## B. *Procedural History*

Ms. Gammon initially filed her complaint in this Court against Reliance Standard in August, 2018, contesting the denial of benefits. In October of that year, Reliance Standard moved to dismiss. I granted the motion to dismiss on December 19, 2018, as to all counts except for the first, denial of ERISA benefits in violation of § 502(a)(1)(B).

Reliance Standard had originally based its analysis on the "independent medical examination" by Dr. Jerrold Rosenberg, who, as it happens, was then under indictment and was later convicted of medical fraud. On January 30, 2019, I remanded Ms. Gammon's claim to Reliance Standard to reconsider Ms. Gammon's eligibility for additional benefits without consideration of Dr. Rosenberg's report, but taking into consideration the Social Security records Ms. Gammon had produced and any peer report

that Reliance Standard obtained.  In April, 2019, Reliance Standard filed its updated report with the court in support of the denial of benefits.  The parties then briefed summary judgment on Ms. Gammon's ERISA claim.

## II. WHO DECIDES MS. GAMMON'S CHALLENGE

At the outset, I must address the question raised by Ms. Gammon concerning who resolves her challenge to Reliance Standard's decision to deny her further benefits.  Ms. Gammon has demanded a jury trial.  However, "ERISA does not provide for a trial by jury and the majority of courts, within and without the First Circuit, have found no congressional intent to provide such a right."  *Turner* v. *Fallon Cmty. Health Plan Inc.*, 953 F. Supp. 419, 423 (D. Mass 1997) (denying plaintiff a jury trial in an ERISA case).  *See also Tracey* v. *Mass. Inst. of Tech.*, No. CV 16-11620-NMG, 2019 WL 1005488, at *4 (D. Mass. Feb. 28, 2019), *aff'd*, 395 F. Supp. 3d 150 (D. Mass. 2019) ("In accord with the great weight of authority in the federal courts holding actions under ERISA to remedy alleged violations of fiduciary duties are equitable in nature, there is no right to a jury trial under the Seventh Amendment in this action.").  The First Circuit has held that juries should not be used where the district court is reviewing ERISA administrative decisions.  *Recupero* v. *New England Tel. & Tel. Co.*, 118 F.3d 820, 831-32 (1st Cir. 1997). In accordance with this precedent, I deny Ms. Gammon's jury

demand.  The responsibility of decision is mine on the basis of the admissible administrative record.

### III. STANDARD OF REVIEW

The standard of review for summary judgment in a case arising under ERISA is somewhat different from the ordinary summary judgment standard.  Rather than evaluating whether there are any genuine issues of material fact to present to a fact finder, the district court in an ERISA dispute "sits more as an appellate tribunal than as a trial court. It does not take evidence but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Leahy* v. *Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002).  Moreover, "the non-moving party is not entitled to the usual inferences in its favor."  *Orndorf* v. *Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005).

In evaluating the reasonableness of the administrative determination, a court must apply a discretionary standard of review where "the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits."  *McDonough* v. *Aetna Life Ins*. *Co.*, 783 F.3d 374, 379 (1st Cir. 2015) (quoting *Firestone Tire & Rubber Co.* v. *Bruch,* 489 U.S. 101, 115 (1989)).  In such cases, where the plan gives an administrator discretion to determine whether an applicant meets the standards to receive benefits, the district court must

"uphold the administrator's decision unless it is arbitrary, capricious, or an abuse of discretion." *Tracia* v. *Liberty Life Assurance Co. of Bos.*, 164 F. Supp. 3d 201, 219 (D. Mass. 2016) (quoting *Young* v. *Aetna Life Ins. Co.*, 146 F. Supp. 3d 313, 328 (D. Mass. 2015)).  In other words, my job is not to determine the "best reading" of the policy, but to determine whether Reliance Standard's "conclusion was 'reasonable.'"  *Arruda* v. *Zurich Am. Ins. Co.*, No. 19-1247, 2020 WL 880548, at *8 (1st Cir. Feb. 24, 2020) (first quoting *O'Shea* v. *UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016); then quoting *Colby* v. *Union Sec. Ins. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 62 (1st Cir. 2013)).

Considered deference is particularly important in cases like this one, because that approach "promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation," "predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review," and "uniformity, helping to avoid a patchwork of different interpretations of a plan… that covers employees in different jurisdictions."  *Arruda*, 2020 WL 880548, at *11 (quoting *Conkright* v. *Frommert*, 559 U.S. 506, 517 (2010)).

Ms. Gammon admits that Reliance Standard's plan "gives discretionary authority to the administrator or fiduciary to determine the eligibility of benefits."  I must therefore defer to Reliance Standard's decision to terminate Ms. Gammon's benefits unless I find that the determination was arbitrary, capricious, or an abuse of discretion.

Under an arbitrary and capricious standard, I am instructed to uphold Reliance Standard's decision if it was "reasonable and supported by substantial evidence on the record as a whole," where "[s]ubstantial evidence" is "evidence reasonably sufficient to support a conclusion."  *Arruda*, 2020 WL 880548, at *8 (first quoting *McDonough*, 783 F.3d at 379; then quoting *Doyle* v. *Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998)).  I must also consider, as a factor in my analysis, that Reliance Standard has a conflict of interest in that it both determines who may receive benefits but then is obligated to pay out any benefits only to those it determines are due them. *Metro. Life Ins. Co.* v. *Glenn*, 554 U.S. 105, 111 (2008).  As with all factors that the court must consider, the conflict of interest factor can act as a "tiebreaker when the others are closely balanced."  *Id*. at 117.

## IV. ANALYSIS

The core issue can be stated simply.  Did Reliance Standard reasonably determine that, as of the benefits denial in 2016,

Ms. Gammon was capable of holding a full-time job and, if not, that her inability to work was at least partially because she was depressed?  Ms. Gammon, for her part, argues that she was physically incapable of working full time, regardless of whether she was depressed.  My job is to determine whether Reliance Standard's decision to the contrary was "reasonable and supported by substantial evidence on the record as a whole." *Arruda*, 2020 WL 880548, at *8; *see also Leahy*, 315 F.3d at 18. In order to explain the relevant evidence in the record as a whole, I will review and resolve these conflicts under the arbitrary and capricious standard.

### A.  *Medical Analyses*

The parties submit opinions from many medical professionals.  I have reviewed in detail for this Memorandum the opinions that the parties have called out in their briefs.

### 1.  Opinions Offered by Ms. Gammon or Her Physicians

Carl Freeman Gustafson, Psy.D., evaluated Ms. Gammon's cognitive and psychological functioning on May 13 and May 21, 2014, on a referral request from her treating physician, Dr. Sidhartha.  Dr. Gustafson concluded that Ms. Gammon is a "bright woman" who has clearly had "a reduction in her functioning from a physical standpoint," but has "solid working memory skills" that were "almost entirely within the average range," and that she meets the criteria for "long term, low grade" depression.

Dr. Gustafson recommended that Ms. Gammon seek more counseling, and suggested that she may benefit from alternative career training, volunteer work, sleep related interventions, more physical activity, and weight loss.

Dr. Birbiglia examined Ms. Gammon on or about November 29, 2016, and wrote a report that he signed under penalty of perjury. He writes that she is unable to sit or stand for twenty minutes at a time, that she has memory problems possibly associated with her pain medications or with a MRSA infection she had at one point, and that she gets bad migraines that can last as long as 20 days. He lists 19 medications that she takes on a regular basis. He concludes, "At this time, in my opinion, she is totally disabled from any gainful employment." He bases this conclusion, in part, on his comment that "[s]he has to rest and lie down multiple times during the day due to pain."

Jaime L. Missios, physical therapist, examined Ms. Gammon on December 19, 2016. Ms. Missios concluded that Ms. Gammon was unable to "meet the physical demand requirements of a Medical transcriptionist," but that she "demonstrated the ability to function in the Sedentary Physical Demand Category, according to the US Department of Labor, for an 8 hour work day according to her material handling capacity." Ms. Missios added that "the results of this evaluation cannot be considered to be an accurate representation of Karen Gammon's functional abilities"

because her responses may have been affected by her automatic implantable cardioverter defibrillator and medication, and the testing did not measure psychosocial barriers that Ms. Missios thought were "apparent."

Dr. Ehrenthal examined Ms. Gammon on October 10, 2017. She reports that Ms. Gammon told her that she cannot tolerate sitting, has a pain level of 7.5/10, and has been frequently tearful over the last six months. Dr. Ehrenthal writes that Ms. Gammon has fibromyalgia, migraines, occasional dizziness, difficulty sleeping, and that she feels depressed and anxious. Dr. Ehrenthal writes that Ms. Gammon's pain comes from a muscle pushing on her sciatic nerve and that physical therapy has not brought relief. Dr. Ehrenthal suggested that Ms. Gammon should be tapered off fentanyl and dilaudid, that she should continue to lose weight, and that she needs to see a psychiatrist to "adjust her medications. Her serotonin seems to be low resulting in tearfulness."

Dr. Sidhartha wrote a letter dated January 17, 2017, advising that he was Ms. Gammon's primary care physician, that she is "unable to function when seated for more than a half hour," and that she "cannot be on her feet most of the day." He stated he concurred with Dr. Birbiglia's 11/29/2016 notes.

### 2. Opinions Offered by Reliance Standard

Dr. Jay Stearns performed a Mental Residual Functional

Capacity Assessment on Ms. Gammon on April 4, 2014, and wrote that "[d]epression & insomnia interferes with gainful employment at present time."

Dr. Jennifer Fay performed a Mental Residual Functional Capacity Assessment on Ms. Gammon on May 6, 2014, and wrote "Pt. exhibits debilitating symptoms of ongoing depression; easily overwhelmed, poor recall, teariness, disturbed sleep cycle, low motivation and irritability."

Dr. Francis A. Bellino reviewed Ms. Gammon's medical records and assessments on July 21, 2016 at Reliance Standard's request. He also reviewed the surveillance footage. He concluded that "Ms. Gammon demonstrates no impairment to sedentary capacity with the ability to move occasionally. This is again demonstrated by her ability to drive, ambulate, carry and manipulate (light objects), and perform errands. She demonstrates mental and cognitive capacity by her ability to navigate to several locations, do errands, and drive." He further concludes,

> Ms. Gammon's medical records do not provide any evidence
> for inability to function on a full-time basis. Although
> she complains of pain at a level of 3/5, the demonstrated
> level of activity (she was out and active for 3 days in
> a row) shows that it does not interfere with consistent
> functioning. The information in the file shows that her
> headaches occur at a frequency and intensity that would
> not interfere with occupational functioning.

<u>3.    Opinion Obtained through a Third Party Vendor</u>

A third party vendor engaged by Reliance Standard selected Dr. Polanco, who is Board Certified in Occupational Medicine, to review Ms. Gammon's physical restrictions and limitations.  Dr. Polanco concluded that,

> As a result of her medical conditions and physical status, she is limited in her ability to perform frequent, prolonged, and strenuous physical activities. While restrictions are supported, the findings do not reflect that the claimant is incapacitated or incapable of full-time, modified physical/work activities as she retains a functional gait, mobility, and has no strength, or neurological deficits.    FCE findings support a sedentary level of work capacity.

**B.    *Analysis of Disputed Issues Raised Regarding the Administrative Record***

<u>1.    Dr. Birbiglia's Examinations</u>

Ms. Gammon asserts that Dr. Polanco did not review Dr. Birbiglia's 2016 and 2018 examinations of her in his review. Dr. Polanco's review, however, in fact references Dr. Birbiglia's 2016 examination in its list of records provided for review.  Ms. Gammon also asserts that she turned over Dr. Birbiglia's 2016 and 2018 examination records to Reliance Standard in her January 23, 2017 appeal.  However, as Reliance Standard points out, Ms. Gammon could not have turned over her 2018 records in her 2017 appeal.

More fundamentally, Reliance Standard argues that it was correct not to consider Dr. Birbiglia's 2018 examination in any

case, because the relevant time period at issue is 2016, when benefits were terminated.  This is the correct approach.  This litigation centers on the reasonableness of Reliance Standard's denial of benefits in 2016, and the proper record to consider is the record that existed in 2016, along with the exceptions I made in this case for consideration of the later SSA record and a non-fraudulent medical examiner.  *See Liston* v. *Unum Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003) ("Where as here review is under the arbitrariness standard, the ordinary question is whether the administrator's action on the record before him was unreasonable.").

### 2.   Dr. Rosenberg's Examination

The parties' dispute about Dr. Rosenberg is no longer material because Reliance Standard, at my direction, does not rely on Dr. Rosenberg's examination in their report since I have held (following his conviction for medical fraud) that they may not.

### 3.   SSDI Benefits

Reliance Standard asserts that Ms. Gammon is receiving SSDI because of her depression, while Ms. Gammon asserts that she is receiving SSDI because of fibromyalgia and back problems.

The SSDI report is murky.  The first page of the SSDI report states that Ms. Gammon's primary diagnosis is fibromyalgia and the secondary diagnosis is disorders of the

back.  Then, under "Medically Determinable Impairments and Severity," the examiner lists severe fibromyalgia as the primary priority, severe spine disorders as the secondary priority, and severe congenital anomalies of the heart, severe migraine, severe obesity, and severe depressive, bipolar, and related disorders as other priorities.  On the next page, however, in an explanation under the header "PRT [psychiatric review technique] – Additional Explanation," the examiner reports that Ms. Gammon "presents with significant depression in the context of medical allegations."  And the examiner later reports that "[t]he claimant reports symptoms and limitations that are out of proportion to the objective findings and x-rays" and that "psych allegations are fully credible."  The examiner ultimately concluded that Ms. Gammon could sit for 6 hours in an 8-hour workday, but that she has postural limitations.  However, the report also concludes that Ms. Gammon "is unable to reliably maintain persistence or pace over a normally workday/workweek" because of "major depression."

The SSDI report admits of several interpretations.  Nevertheless, Reliance Standard's interpretation that the SSA found Ms. Gammon to be physically capable — but psychologically incapable — of work is a reasonable one.

### 4.   Surveillance Issues

Reliance Standard hired an investigative group to surveille

Ms. Gammon for three days, from Monday, May 23 to Wednesday, May 25, 2016.  The first day, she left her house with her husband at about 9:30 AM.  He drove her to doctors' appointments, to a store, and to a restaurant for lunch.  They arrived back home at about 5 PM.  The second day, Ms. Gammon left her house at about 9:30 AM.  She drove herself to doctors' appointments and ran errands such as going to the Dollar Tree and Home Goods stores.  She returned home around 2:30 PM.  The third day, surveillance agents do not know what time she left her house, but observed her at a doctor's office at about 9:30 AM.  She had driven herself there.  She then drove herself to CVS and from there to a Salvation Army Family Store, where she shopped for over an hour for items including dresses.  She left the store holding at least four full shopping bags, a purse, and a large box or book.  She then ran more errands, and agents lost track of her around 2:19 PM.  The surveillance agents surveilled from approximately 7 AM to 5 PM, so we do not know and should not speculate about what she did in the evenings.

This surveillance contradicts Ms. Gammon's asserted limitations and calls into question the reliability of Dr. Birbiglia's report.  Dr. Birbiglia's 2016 report says that "[i]f she sits for more than 20 minutes or stands for more than 20 minutes, she has pain and is unable to function.  She states

most of her days are spent lying down because of her pain.  She
can't drive anymore because of the problem."

Ms. Gammon has contended that she is incapable of driving.
For example, in a questionnaire that she submitted to Reliance
Standard, she wrote, "I cannot drive," and the SSDI report also
says "does not drive."  However, the surveillance shows Ms.
Gammon driving.  It is also reasonable to conclude that someone
who spends three days in a row out of the house from about 9:30
AM to between 2:00 PM and 5:00 PM is not lying down to rest
"multiple times during the day," a factor on which Dr. Birbiglia
rested his conclusion that Ms. Gammon could not work.

The surveillance also potentially contradicts Ms. Gammon's
self-reporting to Dr. Birbiglia that she cannot carry out normal
activities at home such as cooking or cleaning because of both
"stamina" and "pain."  Running errands and shopping can
reasonably be said to take as much effort as normal cooking and
cleaning activities.

The surveillance does not necessarily establish that Ms.
Gammon could work a full-time job.  However, the fact that it
contradicts her assertions does not advance her position and
lends credibility to Reliance Standard's judgment that she is
not disabled within the meaning of the policy.  When surveilled
activities "directly contradict a claimant's asserted
limitations, and there is no definitive evidence of a disabling

condition, the surveillance alone could provide adequate support for a denial of benefits." *Gross* v. *Sun Life Assur. Co. of Canada*, 734 F.3d 1, 25 (1st Cir. 2013). It is reasonable to interpret this surveillance to mean that Ms. Gammon is capable of more than she concedes.

## C.    *Whether Reliance Standard's Determination Was Arbitrary and Capricious*

As explained above, many health care professionals concluded that Ms. Gammon was depressed. However, that is a different question from whether that depression rendered her incapable of full-time work. In 2014, Dr. Stearns wrote in a Mental Residual Functional Capacity Assessment that "depression and insomnia interferes with gainful employment at the present time." Other health care providers said she was depressed but did not opine whether the depression contributed to her inability to work. Nevertheless, a reasonable reading of the SSDI decision is that the SSA determined that Ms. Gammon was physically, but not psychologically, capable of full-time employment.

Opinions about whether Ms. Gammon was capable of full-time employment appear correlated with which party asked for the opinion. The exception is Ms. Missios, who opined after reference by Dr. Sidhartha. Ms. Missios concluded that Ms. Gammon could work a full-time job.

Reliance Standard provided Dr. Polanco with medical records dated 2016 and earlier. Ms. Gammon argues that Reliance Standard was wrong in not providing Dr. Birbiglia's and Dr. Ehrenthal's post-2016 exam records. However, the question for Dr. Polanco was what Ms. Gammon's capacity for work was in 2016, and the question for the Court is whether Reliance Standard abused its discretion in its 2016 decision. *See Liston*, 330 F.3d at 24. Ms. Gammon's physical state may have changed since 2016. But Reliance Standard's decision to deny her benefits in 2016 cannot have been arbitrary and capricious based on her physical state in 2018. *Cf. Gross*, 734 F.3d at 23 ("[H]ow could an administrator act unreasonably by ignoring information never presented to it?").

Drs. Bellino and Polanco, each of whose reports Reliance Standard relies upon, reviewed Ms. Gammon's medical records, but did not meet with Ms. Gammon herself. They concluded that she was capable of full-time work. On the other side is Dr. Birbiglia, who did meet with Ms. Gammon, and said in 2016 that she was totally disabled from working. His report, of course, is called into question by the surveillance. The SSA's analysis is somewhat ambiguous, but may reasonably be read, as I have observed, to conclude that she is physically, but not psychologically, capable of full-time work.

The evidence presented on the record would make it challenging for me to determine "which side is right." However, that is not my job. *See Niebauer* v. *Crane & Co.*, 783 F.3d 914, 928 (1st Cir. 2015) ("Thus, the question before us is not which side is right, but whether the compensation committee's decision to deny Niebauer's claim for severance benefits was reasonable on the record before it."). My job is to determine whether Reliance Standard's conclusion that Ms. Gammon was capable of work was "reasonable and supported by substantial evidence on the record as a whole." *Arruda*, 2020 WL 880548, at *8; *see also Leahy*, 315 F.3 at 18. I find that it was.

The record shows conflicting evidence about Ms. Gammon's capacity to work. Under an abuse of discretion standard, this type of conflicting record supports summary judgment for Reliance Standard. *See Leahy*, 315 F.3d at 18-19. In *Leahy*, the First Circuit "scrutinized the record with care" and concluded "without serious question, that it is capable of supporting competing inferences as to the extent of the plaintiff's ability to work. That clash does not suffice to satisfy the plaintiff's burden." *Id*.

As does this case, *Leahy* involved conflicting evidence. The insurance provider relied, *inter alia*, on independent medical record reviews conducted by doctors, the appearance that the plaintiff was overstating his limitations, suspicious

timing, and an SSA determination that the plaintiff was not disabled. *Id.* Plaintiff argued that the insurer "gave insufficient weight to the views of his treating physicians." *Id.* at 20. The court in *Leahy* found that the views of plaintiff's treating physicians could appropriately be rejected where "other evidence sufficiently contradicts" those views. *Id.* at 21. *See also Tracia*, 164 F. Supp. 3d at 226 (declining to award special weight to the plaintiff's treating physician where that physician's assessment "was based on the plaintiff's subjective reports rather than her own observations or other objective criteria"). The *Leahy* court ultimately held that the "plan administrator's determination, though not inevitable, was solidly grounded." 315 F.3d at 21. *Cf. Tracia*, 164 F. Supp. 3d at 225 (finding a lack of substantial evidence where reviewing physicians did not opine on whether the plaintiff was capable of working). I conclude the same can be said here. The facts here line up fairly well with *Leahy*. Reliance Standard's determination was not inevitable, but it was solidly grounded.

Finally, I recognize Reliance Standard has a conflict of interest because it both determines who will receive benefits and then may become obligated to pay those benefits. *Metro. Life Ins. Co.*, 554 U.S. at 108. I do not, however, find that this conflict renders Reliance Standard's decision arbitrary and

capricious because the decision is supported by a reasonable

reading of the record as a whole.

## V. CONCLUSION

For the reasons given above, Reliance Standard's motion for

summary judgment is GRANTED.

*__Douglas P. Woodlock_____*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE